UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   3/3/15
```

K.M. and S.N. individually and on behalf    :
of L.N.,

                               :

                  Plaintiffs,

                               :

        - against -

                               :

NEW YORK CITY DEPARTMENT OF
EDUCATION,

                               :

                  Defendant.

                               :

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
LEWIS A. KAPLAN**[*]

13cv7719-LAK-FM

--------------------------------------------------------x

**FRANK MAAS**, United States Magistrate Judge.

        This lawsuit is brought on behalf of L.N., a child with autism spectrum

disorder, by his parents, K.M. and S.N. ("Parents").[1]  In their complaint, the Parents seek

review of a decision by a New York State Review Officer ("SRO"), which denied their

request for reimbursement of L.N.'s private school tuition based on a finding that the

New York City Department of Education ("DOE") had offered L.N. a free, appropriate

public education ("FAPE") for the 2011-12 school year.  In reaching this decision, the

SRO overturned the earlier decision of an Impartial Hearing Officer ("IHO").  The

---

[*]      Nathan Trunnell, a student at the New York University School of Law, provided
substantial assistance in the preparation of this Report and Recommendation.

[1]      Certain parts of the sealed administrative record (ECF No. 10) use the true names
of L.N. and his Parents.  To preserve their privacy, I have referred to them by their initials.  K.M.
is L.N.'s mother.

Parents have now moved for summary judgment – in effect, seeking modified de novo review of the SRO's decision.  (See ECF No. 13).  Alternatively, the Parents seek an order requiring the DOE to produce certain previously-subpoenaed documents and remanding this case for a rehearing before an IHO.  (See ECF No. 15 ("Pls.' Mem.") at 34).  The DOE has cross-moved for summary judgment dismissing the case in its entirety. (ECF No. 18).  For the reasons that follow, the DOE's motion should be granted, and the Parents' motion should be denied.

I.    Statutory Framework

In 1975, Congress enacted the Education for All Handicapped Children Act, Pub. L. No. 94–142, 89 Stat. 773 (1975) ("EAHC"), which was the precursor to the Individuals with Disabilities Education Act ("IDEA"), presently codified at 20 U.S.C. § 1400, et seq.  The IDEA seeks to ensure that all children with disabilities have available to them a FAPE "that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).[2]

The "centerpiece" of the IDEA is the Individualized Education Plan ("IEP").  Murphy v. Arlington Cent. School Dist. Bd. of Educ., 297 F.3d 195, 197 (2d

---

[2]    As part of significant revisions in 1990, the EAHC was renamed the IDEA.  See Education of the Handicapped Act Amendments of 1990, Pub. L. No. 101-476, 104 Stat. 1103 (1990).  In 2004, Congress further amended the IDEA pursuant to the Individuals with Disabilities Education Improvement Act, which took effect on July 1, 2005.  See Pub. L. No. 108-446, 118 Stat. 2647 (2004) ("IDEIA").  In keeping with most subsequent cases, I have continued to refer to the statute, as amended, as the IDEA, rather than using the less felicitous, but arguably more accurate, IDEIA acronym.

Cir. 2002) (quoting <u>Honig v. Doe</u>, 484 U.S. 305, 311 (1988)).  "The IEP, which the school district is required to prepare annually, must include the child's present levels of academic achievement and functional performance, goals and objectives for the child, and the special education and related services to be provided to the child so that he or she can advance toward attaining those goals and objectives."  Reyes ex rel. R.P. v. New York City Dep't of Educ., 760 F.3d 211, 214 (citing 20 U.S.C. § 1414(d)).  The IEP is developed by an "IEP Team" – known in New York as a Committee on Special Education ("CSE") – which ordinarily must include the child's parents, a regular education teacher, a special education teacher, and a representative of the local educational agency.  <u>See</u> 20 U.S.C. § 1414(d)(1)(B); N.Y. Educ. Law § 4402(1)(b)(1).

Both the IDEA and New York law provide comprehensive procedural safeguards for parents challenging an IEP.  <u>See</u> 20 U.S.C. §§ 1415(f)-(g); N.Y. Educ. Law § 4404.  In New York, if the parents deem the CSE recommendation unacceptable, they may challenge it by filing a "due process complaint notice," which triggers a process by which the school district appoints an IHO to conduct an "impartial due process hearing."[3]  N.Y. Educ. Law § 4404(1)(a).  An adverse decision by the IHO may be appealed by either party to an SRO.  <u>Id.</u> § 4404(1)(c).  After the SRO rules, either party may seek further review in a federal district court or a state court of competent jurisdiction.  20 U.S.C. §§ 1415(i)(1), (2); N.Y. Educ. Law § 4404(3)(a).

---

[3]        The due process complaint is an "administrative challenge unrelated to the concept of constitutional due process."  R.E. v. New York City Dep't of Educ., 694 F.3d 167, 175 (2d Cir. 2012).

Additionally, parents who believe that a school district has failed to provide their child with a FAPE may "unilaterally enroll the child in a private school" and subsequently "seek tuition reimbursement from the school district." Reyes, 760 F.3d at 215 (citing 20 U.S.C. § 1412(a)(10)(C)(ii)). Parents who do so, however, "pursue this option at their financial risk." Id. The Parents and DOE agree that tuition reimbursement in the aftermath of a unilateral placement in a private school may be authorized only if (a) the proposed IEP failed to provide the student with a FAPE; (b) the private school was appropriate for the child's needs; and (c) equitable considerations support reimbursement. (See Pls.' Mem. at 18-19; ECF No. 19 ("Def.'s Mem.") at 10-13 (both citing Sch. Comm. of Town of Burlington v. Dep't of Educ. of Mass., 471 U.S. 359 (1985), and Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter, 510 U.S. 7 (1993))). Under New York law, "the school district [must] prove that its 'proposed IEP provided the child a FAPE,' but the parents must prove 'the appropriateness of the private placement.'" Hardison v. Bd. of Educ. of the Oneonta City Sch. Dist., 773 F.3d 372, 377 (2d Cir. 2014) (quoting Reyes, 760 F.3d at 215) (citing N.Y. Educ. Law § 4404(1)(c)).

II.   Relevant Facts

A.   L.N.

The following facts taken from the administrative record are undisputed unless otherwise indicated.[4]

---

[4]   Unless otherwise indicated, citations to "Ex." refer to the exhibits in the administrative record. (ECF No. 10). "Tr." refers to the transcript of the proceedings before the

(continued...)

L.N. was born on June 2, 2000, and thus was eleven years old for most of the 2011-12 school year.  (Ex. A at 1).  He has been diagnosed with autism spectrum disorder.  (Id.).  Prior to the 2011-12 school year, L.N. had attended The McCarton School ("McCarton") for nine years.[5]  (See id.; Tr. at 598).  L.N. is a hard-working and cooperative student, with a demonstrated willingness to learn, who has been making progress both academically and socially.  (Tr. at 61).

L.N. nevertheless has severe developmental delays.  For example, his reading and math abilities are at a first grade level, he has difficulty maintaining focus, and he requires continuous prompting and fast-paced instruction.  (Id. at 62-63, 235-36, 575).  L.N. also requires a predictable schedule because deviations can cause him to manifest injurious and self-stimulatory behaviors.   (Id. at 308, 575, 596-97).  His interfering behaviors have changed over time, but include non-contextual vocalizations, hand play and movements, tapping, and screaming.  (Id. at 308, 575-76).  L.N. also struggles to speak intelligibly and has limited expressive and receptive vocabularies.  (Id.

---

[4](...continued)
IHO.  "IHO Decision" and "SRO Decision" refer, respectively, to the IHO and SRO administrative decisions.  (See ECF No. 14 (Decl. of Jean Marie Brescia dated Apr. 15, 2014) ("Brescia Decl."), Exs. A (IHO Decision), B (SRO Decision)).

[5]       The McCarton School is a private school in New York City that "provides an intensive educational program for children, teens, and young adults diagnosed with [autism spectrum disorder]."  See http://mccartonschool.org.  The school offers "[s]mall classrooms with 1:1 ratios, small group instruction and a teaching philosophy that integrates speech and language therapy, occupational therapy and social skills training under an umbrella of Applied Behavior Analysis (ABA)."  Id.

at 62, 533).  Many of L.N.'s interfering behaviors stem from his limited ability to communicate his needs and wishes verbally.  (Id. at 313-14).

### B.   IEP Development and Final Recommendation

On June 15, 2011, K.M. attended a CSE meeting to develop L.N.'s IEP for the 2011-12 school year.  (Id. at 570; see Ex. at 235-54 ("IEP")).  At the meeting, the DOE was represented by social worker Ariela Garofalo-Bergier ("Garofalo-Bergier"), psychologist Sandra Duke, special education teacher Jane O'Connor, and parent member Carmen Garcia.  (IEP at 2).  Three McCarton staff members also participated:  L.N.'s supervising teacher, Irene Chan ("Chan"); L.N.'s occupational therapist, Paula Welch ("Welch"); and L.N.'s speech and language therapist, Tara Egloff.  (The participants in the meeting are hereinafter referred to, collectively, as L.N.'s "IEP Team").  (Id.).

Ultimately, the DOE recommended that L.N. be placed in a year-round "6:1:1" special education class in a special education school – i.e., a class of no more than six students taught by a special education teacher with the assistance of a paraprofessional.[6]  (Tr. at 73-74; IEP at 17).  The DOE further recommended that this staffing be augmented with an additional full-time behavior management paraprofessional to provide L.N. with one-to-one support throughout the entire school day.  (Tr. at 73-74; IEP at 17).  Finally, the DOE recommended that L.N. receive one group and four

---

[6]     A "paraprofessional" assists the classroom teacher by providing students with "instructional support."  34 C.F.R. § 200.58(a)(2)(i); see 8 N.Y.C.R.R. § 120.6(b).

individualized occupational therapy sessions, and two group and five individualized speech and language therapy sessions, each week.  (IEP at 19).[7]

The DOE considered several larger class placements including a 12:1:1 and 8:1:1 placement, as well as a 6:1:1 placement without a behavior management paraprofessional, but rejected them because L.N. required additional support.  (Id. at 18). The DOE also rejected the McCarton staff's opinion that 6:1:1 instruction would be inadequate, and that one-to-one instruction by a special education teacher was required because of L.N.'s inability to concentrate and his interfering behaviors.  (Tr. at 575).  On or about July 1, 2011, Garofalo-Bergier mailed a copy of the IEP to the Parents.  (IEP at 2; Tr. at 97-99).[8]

The IEP Team did not conduct its own Functional Behavior Assessment ("FBA"), as New York law requires, to determine why LN "engage[d] in behaviors that impede[d] learning and how [his] behavior relate[d] to the environment."  See 8 N.Y.C.R.R. § 200.1(r).  Nevertheless, the IEP Team developed a Behavior Intervention Plan ("BIP") based on input from Chan, L.N.'s supervising teacher at McCarton, as well as the McCarton "Behavior Reduction Plan" for L.N.  (See Tr. 58, 68-69, 100-01; IEP at 20; Ex. L at 1-4).  A BIP ordinarily is "based on the results of a[n FBA]."  8 N.Y.C.R.R.

---

[7]     All of these sessions other than the group speech and language therapy sessions were to be forty-five minutes long.  The group speech and language therapy classes were to be thirty minutes long.  (IEP at 19).

[8]     Although the record is unclear as to when the Parents actually received the IEP, (Tr. 580-81), a factual question implicated by one of the Parents' procedural challenges, the written IEP was dated July 1, 2011.  (Id. at 97-99).

§ 200.1(mmm).  "[A]t a minimum," a BIP "includes a description of the problem behavior, global and specific hypotheses as to why the problem behavior occurs and intervention strategies that include positive behavioral supports and services to address the behavior."  Id.

The BIP identified L.N.'s interfering behaviors, including inattention during class, non-contextual vocalization and movements, banging of desk or objects, screaming, and occasional biting, scratching, pinching or hitting.  (IEP at 20).  The BIP also identified the triggers for these behaviors and strategies to reduce them.  For example, the BIP indicated that L.N. would be positively reinforced if he stayed quiet and kept his hands down.  Specifically, the BIP suggested the use of a "token economy system" to reinforce positive behavior and disincentivize interfering behaviors.[9]  Additionally, the BIP indicated that when L.N. behaved in a physically inappropriate manner, his hands would be redirected to his sides.  Finally, the BIP noted the need to model and reinforce positive interactions and reinforce positive forms of communication.  (Id.).

On June 16, 2011, the DOE issued a Final Notice of Recommendation ("FNR") reflecting the DOE's recommendation of a 6:1:1 placement for L.N. with a behavior management paraprofessional.  (Ex. H at 1).  K.M. testified that she did not recall when she actually received the FNR, but the Parents do not dispute the SRO's

---

[9]     "Within an educational setting, a token economy system is a system for providing positive reinforcement to . . . children by giving them tokens for completing tasks or behaving in desired ways."  See Educate Autism, What is a Token Economy, www.educateautism.com/ token-economy.html.

finding that they received the FNR after the CSE meeting and prior to the beginning of the 2011-12 school year. (<u>See</u> Tr. at 580-81; SRO Decision at 17; Pls.' Mem. at 10-11, 21). The FNR identified the specific site where L.N. would receive the IEP's recommended services as "P94M at P188M" ("P188M"). This was a specialized school within another public school. (See Ex. H at 1).

On June 30, 2011, the Parents submitted a "Demand For Due Process" ("Demand") to the Impartial Hearing Office of the DOE. (<u>See</u> Ex. A at 1-8). In their Demand, the Parents alleged that the DOE had denied L.N. a FAPE, expressed their intention to keep L.N. enrolled at McCarton for the 2011-12 school year, and requested a hearing before an IHO to seek reimbursement of L.N.'s McCarton tuition. (<u>Id.</u> at 1-2, 78). The Demand detailed nearly sixty alleged procedural and substantive shortcomings related to the DOE's recommended placement. (Id. at 2-7).

Because L.N. had been recommended for enrollment in a year-round program, his 2011-12 school year was slated to begin on July 5, 2011. (Tr. at 93). On July 8, 2011, after the school year began, K.M. attempted to visit P188M. (<u>Id.</u> at 582). She was unable to gain entry, however, because the site was under construction. While at P188M, K.M. attempted to call Martin Bassis ("Bassis"), the DOE placement officer listed as a point of contact in the FNR. (<u>Id.</u> at 582-83). This attempt was unsuccessful because Bassis had retired from the DOE. (Id. at 120). That same day, K.M. sent a fax to Gerard Donegan ("Donegan"), the chairperson of L.N.'s local CSE, giving him "reiterated notice" that the Parents were rejecting L.N.'s IEP and proposed placement and

intended to hold the DOE responsible for L.N.'s McCarton tuition.  (Ex. G at 1).

Unbeknownst to K.M., students enrolled at P188M for the summer had been relocated to

another P94M site only two blocks away – P15M – for the duration of the summer

construction at P188M.  (Tr. at 401-02).

On September 27, 2011, K.M. successfully visited the reopened P188M.

(See Ex. F at 1).  She subsequently sent a second letter to Bassis listing the reasons why

she deemed P188M and the proposed class placement inadequate for L.N.'s needs.  (Id. at

1-2).

C.     Administrative Proceedings

1.     IHO Decision

IHO Martin J. Kehoe, III ("IHO Kehoe") held an impartial hearing over the

course of seven days between August 9, 2011, and June 21, 2012.  (See Tr.).  The IHO

heard testimony from nine witnesses, six of whom were called by the Parents.  In his

decision, dated January 28, 2013, the IHO found that the DOE had denied L.N. a FAPE

for the 2011-12 academic year, that McCarton was an appropriate placement for L.N.,

and that equitable considerations supported tuition reimbursement.  Consequently, IHO

Kehoe ordered the DOE to reimburse the Parents fully for L.N.'s tuition at McCarton for

the 2011-2012 academic year, plus the cost of certain additional home-based services.

(See IHO Decision at 18).

Addressing the first prong of the test established by the Burlington/Carter

decisions, the IHO chose not to discuss many of the alleged procedural and substantive

violations that the Parents had identified in their Demand.  (Id. at 12-14).  Instead, IHO

Kehoe held simply that the DOE's decision to reject McCarton's programming

recommendation of intensive one-to-one ABA therapy, and direct instead a 6:1:1

placement combined with a one-to-one behavior management paraprofessional, gave rise

to a substantive violation of the IDEA, since the DOE had adopted "nearly every piece of

evaluative data . . . from [McCarton,] but . . . rejected the substance of [McCarton's]

programming."  (Id. at 13).  The IHO specifically cited the DOE's decision to adopt the

BIP, based on "years of work" at McCarton, yet render it "virtually useless" by not

recommending the "intensive ABA environment," in which it had been developed.  (Id.).

        In reaching his decision, the IHO noted that "[t]here is no opinion in the

entire record that finds fault with [one-to-one ABA therapy]," or that "supports removing

the ABA therapy."  (Id.).  The IHO also cited the testimony of Nina Berke, a special

education teacher at P188M, who presumably would have been the teacher of the 6:1:1

class recommended for L.N.  (See Tr. at 205-208, 245).  The IHO criticized Berke's

opinion that L.N. "would be appropriate for group instruction," in light of the conflicting

position of "all of the educators who had worked with [L.N.] and the Parent[s]," Berke's

inability to identify "the type of programming that [L.N.] had been exposed to during the

preceding year" at McCarton, and her lack of familiarity with "the use of a transition

plan."  (IHO Decision at 13).

Turning to the second and third prongs of the Burlington/Carter test, the IHO found that McCarton was an appropriate placement for L.N., and that there was no equitable reason to deny the Parents' reimbursement request.  (Id. at 14-18).

2.      SRO Decision

The DOE appealed the IHO's adverse decision to the SRO.  On August 14, 2013, SRO Justyn P. Bates ("SRO Bates") issued a decision reversing the IHO's tuition reimbursement award based on his determination that the DOE had, in fact, made a FAPE available to L.N. for the 2011-12 school year.  (SRO Decision at 44).  In reaching that decision, the SRO reviewed the lengthy record before the IHO.  (Id. at 1).  Unlike the IHO, SRO Bates addressed each of the procedural and substantial challenges raised by the Parents.  The SRO's findings and conclusions, insofar as relevant to this proceeding, were as follows:

a.      Timeliness of the June 2011 IEP

As SRO Bates noted, the "IDEA requires that a district must have an IEP in effect at the beginning of each school year for each child in its jurisdiction with a disability."  (Id. at 17 (citing 34 C.F.R. § 300.323(a); 8 N.Y.C.R.R. § 200.4 (e)(1)(ii); Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 194 (2d Cir. 2005); Tarlowe v. New York City Bd. of Educ., No. 07 Civ. 7936 (GEL), 2008 WL 2736027, at *6 (S.D.N.Y. July 3, 2008)).  Moreover, parents of each disabled child must be provided with a copy of the IEP.  (Id. (citing J.G. v. Briarcliff Manor Union Free Sch. Dist., 682 F. Supp. 2d 387, 396 (S.D.N.Y. 2010)).  The SRO found with respect to these requirements that, during the

CSE meeting, the Parents had received a draft copy of the IEP, which then was "amended and adjusted where appropriate."  (Id. (citing Tr. at 65-66)).  Thereafter, the final IEP was sent to the Parents on July 1, 2011.  (Id. (citing Tr. at 97-98)).  Although the SRO found that the hearing record was unclear as to the exact date the Parents received a copy of the IEP, he concluded that this likely occurred "on or about [the] first day of the 12-month 2011-12 school year, which . . . began on July 5, 2011."  (Id.).  Accordingly, the SRO held that, even if the DOE did commit a procedural violation by "delaying transmittal of the finalized copy of the IEP," that violation did not deny L.N. a FAPE, "significantly impede[] the [P]arents' meaningful participation in the CSE process," or "cause[] a deprivation of education benefits."  (Id. at 18).  In arriving at this determination, the SRO noted that the FNR – which identified the recommended classroom placement and specific school site – had been issued prior to the beginning of the school year.  (Id. at 17).  Furthermore, the Parents' Demand, which listed some sixty challenges to the IEP, was dated June 30, 2011, and therefore prepared before the July 1 copy was mailed.  (Id. at 17-18).

        b.     Class Placement and Programming

        Turning to the issue that IHO Kehoe considered dispositive, SRO Bates rejected the Parents' contention that a 6:1:1 placement denied L.N. a FAPE, concluding instead that the addition of a behavior management paraprofessional dedicated solely to helping L.N., as well as four weekly sessions of one-to-one occupational therapy and five weekly sessions of one-to-one speech and language therapy, constituted an appropriate

response to L.N.'s educational needs.  (Id. at 21-24).  In reaching that conclusion, the

SRO noted that McCarton itself did not provide L.N. "with a 1:1 environment per se in

the sense that [he] required exclusion from placement with other same-aged peers."  (Id.

at 23).  Observing that the instruction at McCarton also occurred in a group setting, albeit

with more intensive staffing, the SRO rejected the IHO's conclusion that the DOE had

"adopted 'nearly every piece of evaluative data used in preparing [L.N.'s] IEP from'

McCarton," but had "rejected the substance of McCarton's programming, namely the

provision of 1:1 instruction."  (Id. (quoting IHO Decision at 13)).

             SRO Bates acknowledged, that during the June 2011 CSE meeting, K.M.

and the McCarton participants had disagreed with Garofalo-Bergier with respect to the

appropriateness of a 6:1:1 placement, but he credited Garofalo-Bergier's testimony that

this small class setting was appropriate for L.N., catered to students with similar learning

profiles, and would adequately support L.N.'s areas of deficit.  (Id. at 21-22).  The SRO

further credited Garofalo-Bergier's testimony that one-to-one paraprofessional support

would provide L.N. with the structure he had become accustomed to at McCarton and

adequately ease his transition into the new educational setting.  (Id. at 22).  The SRO also

cited Garofalo-Bergier's classroom observation of L.N. at McCarton as support for her

conclusion that L.N. "could function in a group setting with the provision of [one-to-one]

prompting."  (Id.).  The SRO noted that the reports from McCarton stating that L.N.

required instruction in a one-to-one setting also showed that L.N. could learn in group

situations, was progressing in social skills with his peers, and was able to participate in

group settings.  (Id. at 23).

Finally, the SRO noted that the IDEA does not require a school district to afford a student the "best opportunities" for progress.  (Id.).  Accordingly, he concluded that even though the Parents believed that intensive one-to-one ABA services would be best for L.N., "it [did] not necessarily follow that [they] may select one particular method to the exclusion of other[s]," or that McCarton's program was the only appropriate one for L.N.  (Id. at 24).[10]

   c. FBA and BIP

Although SRO Bates acknowledged the importance of conducting a proper FBA, he nevertheless rejected the Parents' contention that the IEP Team's failure to do so, and the effect of that violation on the formulation of a BIP, denied L.N. a FAPE.  (Id. at 27-32).  In arriving at this determination, the SRO noted that the CSE had carefully reviewed, and incorporated into the IEP, both the "McCarton educational, speech-language, and [occupational therapy] progress reports" and Garofalo-Bergier's classroom observations concerning L.N., thereby setting forth considerable information regarding L.N.'s interfering behaviors.  (Id. at 29).  The SRO noted further that the IEP Team had considered the triggers for those behaviors and the appropriate way to resolve them.  (Id.).  For these reasons, the SRO found that, despite the absence of a formal FBA, the BIP was based on the IEP Team's discussion of "the frequency, duration and antecedents of

---

[10] Indeed, the SRO noted that the "precise teaching methodology to be used by a student's teacher is usually a matter to be left to the teacher."  (Id. at 25 (collecting cases)).

[L.N.'s] interfering behaviors."  (Id.).  The SRO therefore held that the failure to prepare

a formal FBA did not warrant the conclusion that the DOE had failed to offer L.N. a

FAPE because the CSE had identified L.N.'s major interfering behaviors and

recommended "services and supports" to address them.  (Id. at 29-30).

The SRO also noted that, despite the lack of an FBA, the DOE had

developed a BIP, which was included in L.N.'s IEP.  As the SRO observed, if a BIP for a

student is necessary, it must identify

> "(i) the baseline measure of the problem behavior, including
> the frequency, duration, intensity and/or latency of the
> targeted behaviors . . .; (ii) the intervention strategies to be
> used to alter antecedent events to prevent the occurrence of
> the behavior, teach individual alternative and adaptive
> behaviors to the student, and provide consequences for the
> targeted inappropriate behavior(s) and alternative acceptable
> behavior(s); and (iii) a schedule to measure the effectiveness
> of the interventions, including the frequency, duration and
> intensity of the targeted behaviors at scheduled intervals."

(Id. at 30 (quoting N.Y.C.R.R. § 200.22(b)(4)).  In that regard, the SRO found that the

BIP and IEP described the behaviors that interfered with L.N.'s learning and articulated

how those behaviors would be addressed.  (Id. at 31).  The SRO also observed that the

BIP incorporated additional supports to address L.N.'s interfering behaviors, including

instruction from a special education teacher, collaboration between home and school, the

provision of a one-to-one behavior management paraprofessional, and the use of a

positive reinforcement schedule and token economy system.  (Id. at 31).  Furthermore, the

IEP contained "annual goals and short-term objectives designed to improve [L.N.'s]

ability to communicate and to improve organization and self-regulation by inhibiting non-purposeful movements." (Id. at 32). Accordingly, although the BIP itself did not include information regarding the "frequency, duration, [and] intensity of function of [L.N.'s] behavior," the SRO found that this "technical" violation "did not . . . result in the loss of educational opportunity for [L.N.] or rise to the level of the denial of a FAPE." (Id.).

d.    Parent Counseling and Training

The SRO also addressed the Parents' claim that the failure to incorporate parent counseling into L.N.'s IEP constituted a procedural violation. (Id. at 34-36). The SRO noted that parent counseling and training were offered at P188M, and that the school had a coordinator who served as a liaison with parents. (Id. at 35). As he further observed, P188M's Assistant Principal testified that parent counseling and training were available to parents on an as-needed basis, and Berke, the P188M special education teacher to whom L.N. likely would have been assigned, testified that she actively encouraged communication with her students' parents and met with them multiple times throughout the school year to discuss their concerns. (Id.; see Tr. at 245). Based on these and other examples of the parent counseling and training available at P188M, the SRO found that the failure to recommend parent counseling and training did not deprive L.N. of a FAPE. (Id. at 35-36).

e.    School Site Construction

Finally, the SRO rejected the Parents' argument that L.N. was denied an adequate school placement because P188M was not operational during the summer of

17

2011. (Id. at 38-39).  Acknowledging that P188M was under construction during K.M.'s first visit, the SRO nevertheless concluded that the IEP would have been adequately implemented had L.N. enrolled in P188M.  (Id.).  As the SRO explained, although the school L.N. was assigned to by the FNR was not housed in the designated physical structure during the summer of 2011, another school site was available to accommodate the students assigned to P188M and was capable of providing each of the services recommended in L.N.'s IEP.  (Id. at 38).  The SRO also concluded that the DOE had taken reasonable measures to notify the parents of students enrolled there about the temporary change in location.  (Id. at 39).

III.    Discussion

         The question presented by the cross-motions is whether SRO Bates erred in reversing the IHO's finding that the DOE failed to provide L.N. a FAPE.  In that regard, the Parents challenge the SRO's decision, and more generally L.N.'s IEP, on the grounds that:  (a) the DOE failed to provide L.N. with a physical school placement for the summer of 2011; (b) the DOE failed to have an IEP in effect at the beginning of the school year; (c) the IEP Team failed to conduct an FBA and draft an appropriate BIP; (d) the recommended 6:1:1 placement was not appropriate for L.N.'s educational needs; and (e) the DOE failed to recommend parent training and counseling.  The DOE disputes each of these assertions, maintaining that the SRO properly reversed the IHO's decision based on his determination that the DOE had provided L.N. with a FAPE.

A.      Standard of Review

Although both sides have moved for summary judgment, the Court's task in an IDEA case extends beyond the usual inquiry into whether there are disputed issues of material fact.  Accordingly, such motions serve as a "'pragmatic procedural mechanism' for reviewing a state's compliance with the procedures set forth in [the] IDEA and determining whether the challenged IEP is reasonably calculated to enable the child to receive educational benefits."  Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ., 397 F.3d 77, 81 n.3 (2d Cir. 2005) (quoting Warton v. New Fairfield Bd. of Educ., 217 F. Supp. 2d 261, 270 (D. Conn. 2002)).  In substance, a summary judgment motion in an IDEA case serves as an appeal from an administrative decision, in which the Court reviews the entire administrative record.  Id.  The Court then must make an "independent decision[ ] based on a preponderance of the evidence."  Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley, 458 U.S. 176, 205 (1982) (quoting S. Conf. Rep. No. 94-455, at 50 (1975), as reprinted in 1975 U.S.C.C.A.N. 1503) (internal quotation marks omitted).

Independent review is not "an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review."  Id. at 206.  Thus, courts are required to "bear in mind the statutory context and the administrative judges' greater institutional competence in matters of educational policy."  R.E., 694 F.3d at 189 (citing M.H. v. New York City Dep't of Educ., 685 F.3d 217, 244 (2d Cir. 2012)).  As the Second Circuit has explained, courts "must give 'due

weight' to the administrative proceedings, mindful that the judiciary generally 'lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'"  A.C. ex rel. M.C. v. Bd. of Educ. of Chappaqua Cent. Sch. Dist., 553 F.3d 165, 171 (2d Cir. 2009) (quoting Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 113 (2d Cir. 2007)) (brackets omitted); see Hardison  v. Bd. of Educ. of Oneonta City Sch. Dist., 773 F.3d 372, 387 (2d Cir. 2014) ("Expertise in an area speaks not only to the ability to reach the right conclusion about a given factual situation but also the ability to discern how much evidence is required to reach a supportable conclusion at all.").

        In light of these principles, when the findings of the IHO and SRO conflict, a court should defer to the final administrative decision, which in this case is the SRO's decision.  See R.E., 694 F.3d at 189.  Indeed, because education officials have institutional expertise in educational policy that district courts lack, the Second Circuit has reiterated that "deference to administrative proceedings is particularly warranted where . . . the district court's decision [is] based solely on the administrative record." Hardison, 773 F.3d at 387 (quoting M.H., 685 F.3d at 218) (internal quotation marks omitted).  "In the ordinary case, '[i]t is not for the federal court to choose between the views of conflicting experts.'"  (Id. at 386 (quoting R.E., 694 F.3d at 189) (alteration in original).  Thus, a court's willingness to draw a different conclusion from the

administrative record than that of the SRO is insufficient to undermine the SRO's reasoning.  See Cerra, 427 F.3d at 196.[11]

B.     Tuition Reimbursement Under the IDEA

As noted earlier, the Supreme Court has articulated a three-prong test for determining whether parents are entitled to tuition reimbursement under the IDEA.  See Burlington, 471 U.S. at 369-70; Carter, 510 U.S. at 15-16.  First, a court must determine whether the IEP proposed by the school district provided the child a FAPE.  Carter, 510 U.S. at 15.  If the IEP was inappropriate, the court then considers whether the private placement was appropriate to the child's needs.  Id.  Finally, "because the authority to grant reimbursement is discretionary, 'equitable considerations . . . are relevant in fashioning relief.'"  Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356, 363-64 (2d Cir. 2006) (quoting Burlington, 471 U.S. at 374).

Turning to the first prong of the Burlington/Carter test – whether the school district offered a FAPE to L.N. – logic dictates that the Court first consider whether the DOE complied with the procedural protections of the IDEA.  See Cerra, 427 F.3d at 192. If so, the Court next must determine whether the IEP is "substantively appropriate in that

_____

[11]     In deciding the degree of deference to be accorded to an SRO's administrative opinion, the Second Circuit has also suggested the following bright line rules: "[D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures. Decisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress.  Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not."  R.E., 694 F.3d at 189 (quoting M.H., 685 F.3d at 244).

it is 'reasonably calculated to enable the child to receive educational benefits.'"  T.P. ex

rel S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 252 (2d Cir. 2009) (quoting

Cerra, 427 F.3d at 192).  I will consider both questions in turn.  Before doing so,

however, I will address the Parents' assertion that the SRO's decision should be

disregarded in its entirety based upon his finding that the matter before him was moot.

    1.    <u>SRO's Finding of Mootness</u>

Without citing any authority, the Parents urge the Court to disregard the

SRO's lengthy decision and thus adopt the IHO's decision.  The Parents make this novel

application because the SRO stated that "the parties' dispute regarding the 2011-12

school year [was] no longer a live controversy and ha[d] been rendered moot" once the

DOE funded L.N.'s placement at McCarton for the 2011-12 school year.[12]  (Pl's Mem. at

17-18; SRO's Decision at 44).  Indeed, the SRO described his discussion of

reimbursement for that year's tuition as "academic."  (SRO's Decision at 44).

The SRO's references to the dispute as "moot" and to his decision as

"academic" do not mean that this Court should treat the SRO decision as a nullity and

defer to the IHO.  As a threshold matter, although the Parents contend that the "SRO

elected voluntarily to render his decision an 'academic' exercise," even they do not

---

[12]    During the pendency of special education proceedings, "unless the state or local education agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child."  20 U.S.C. § 1415(j) (the "stay-put" provision); see N.Y. Educ. L. § 4404(4)(a). Accordingly, "[a] claim for tuition reimbursement pursuant to the stay-put provision is evaluated independently from the evaluation of a claim for tuition reimbursement pursuant to the inadequacy of an IEP."  Mackey ex rel. Thomas M. v. Bd. of Educ. for Arlington Cent. Sch. Dist., 386 F.3d 158, 160 (2d Cir. 2004).

suggest that this case is actually moot.  (See Pls.' Mem. at 17-18).  Nor could they.

Because IDEA disputes often last longer than the pendency of the challenged IEP,

rendering them potentially "capable of repetition, yet evading review," courts do not

insist that IDEA suits comply with the "usual requirement that an actual controversy exist

at all stages of litigation."  See Bd. of Educ. of Pawling Cent. Sch. Dist. v. Schutz, 290

F.3d 476, 478 n.1 (2d Cir. 2002).

   There also is no basis for the Parents' alternative suggestion that the SRO's

remarks, which appear only on the last full page of his decision, warrant according his

views as to the central issues in this case less deference.  (See Pls.' Mem. at 18).  SRO

Bates addressed each of the Parents' allegations extensively and much more throughly

than did the IHO, who focused primarily on one of the Parent's claims.  Ultimately, the

weight to be accorded to administrative judgments, as with any judgment, must be

determined by considering such factors as the "quality and thoroughness of the reasoning,

the type of determination under review, and whether the decision is based on the

administrative body's familiarity with the evidence and the witnesses."  Hardison, 773

F.3d at 386 (quoting Reyes, 760 F.3d at 218).  These factors, not a passing ill-phrased

reference acknowledging that the Parents will receive payment for the 2011-12 school

year, are what must dictate the result.  Accordingly, I will turn to whether the record

supports the SRO's findings of fact and conclusions of law.

2.      Procedural Compliance

"The initial procedural inquiry in an IDEA case 'is no mere formality,' as 'adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.'" T.P., 554 F.3d at 252–53 (quoting Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998)) (certain internal quotation marks omitted). Nonetheless, not every procedural violation will necessarily render an IEP legally inadequate. Y.S. v. New York City Dep't of Educ., No. 12 Civ. 2590 (WHP), 2013 WL 5722793, at *8 (S.D.N.Y. Sept. 24, 2013). Rather, to rise to the level of reversible error, the procedural inadequacies must have: "[a] impeded the child's right to a [FAPE]; [b] significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a [FAPE] to the parents' child; or [c] caused a deprivation of educational benefits." 20 U.S.C. §§ 1415(f)(3)(E)(ii)(I)-(III). Here the Parents allege that these wrongs occurred because the DOE failed to (a) have an IEP in effect at the beginning of the school year, (b) conduct an FBA and draft an appropriate BIP, and (c) recommend parent training and counseling in the IEP.

a.      Failure to Have IEP In Effect

Turning first to the claim that the IEP was procedurally deficient because it was not in effect at the beginning of the 2011-12 school year, the Parents allege that the DOE failed to provide them with L.N.'s IEP by the first day of the school year, thereby

impeding "their right to give informed consent or provide an informed rejection" with respect to L.N.'s IEP.  (Pls.' Mem. at 22).

        The DOE is required to have a written IEP "in effect" for each child with a disability "[a]t the beginning of each school year."  20 U.S.C. §§ 1414(d)(1)(A)(i), 1414(d)(2)(A); see 34 C.F.R. § 300.342(a); 8 N.Y.C.R.R. § 200.4(e)(1)(ii).  In New York State, by statute, the school year begins on the first day of July of each year.  N.Y. Educ. Law § 2(15).  An IEP is considered "in effect" by that date if a school district has recommended a specific placement for a child.  See Tarlowe, 2008 WL 2736027, at *6.  Although the IDEA does not specify the date by which parents must receive an IEP, the "Second Circuit has held that as long as the parents are provided with the IEP before the first day of school, the district has fulfilled its legal obligation under the statute."  B.P. v. N.Y.C. Dep't of Educ., No. 14 Civ. 1822 (LGS), 2014 WL 6808130, at *8 (S.D.N.Y. Dec. 3, 2014) (citing Cerra, 427 F.3d at 193-94).

        Here, the Parents are correct that the IEP was not mailed to them until July 1, 2011, at the earliest.  (Tr. 97-98, 164; IEP at 2).  Although this was the official first day of the 2011-12 school year, as Garofalo-Bergier testified, New York City schools did not actually open that year until Tuesday, July 5, because of the Independence Day holiday. Accordingly, the Parents would have received their copy of the IEP on or about the date the school year actually began.  (See Tr. at 92-93).  Even if the IEP arrived late, there are several reasons why this did not prejudice them.  First, the FNR from the DOE is dated on our about June 16, 2011.  (See Ex. H).  Although K.M. did not recall when she actually

received the FNR, (id. at 574, 580-81), the Parents do not dispute the SRO's finding that they received it after the CSE meeting and prior to the beginning of the 2011-12 school year. (See SRO Decision at 17; Pls.' Mem. at 10-11, 21). The FNR identified P188M as L.N.'s recommended school site, and described the IEP Team's recommendation of a 6:1:1 placement with a behavioral management paraprofessional and related services. (Ex. H at 1). Second, K.M. was an active participant during the CSE meeting on June 15, 2011, during which the IEP was developed. (Tr. at 570-73); see S.F. v. New York City Dep't of Educ., No. 11 Civ. 870 (DLC), 2011 WL 5419847, at *12-13 (S.D.N.Y. Nov. 9, 2011) (participation in CSE meeting and timely delivery of FNR provided parents with an adequate opportunity to be involved in the decision making process concerning child's education). She therefore understood that the DOE was going to reject McCarton as the placement for the coming school year. Finally, the CSE meeting and FNR clearly provided the Parents with sufficient information to make a timely decision regarding the IEP, since their counsel sent the DOE Impartial Hearing Office an eight-page Demand addressing the IEP's alleged shortcomings in great detail on June 30, 2011, the day before the new school year began.

This case consequently is a far cry from the type of "bait and switch," condemned in R.E., which the Parents have cited for the proposition that "parents are entitled to rely upon the written contents of their child's IEP . . . when determining whether to accept or reject the program offered by the district." (Pls.' Mem. at 23) (citing R.E., 694 F.3d at 186). There, the DOE attempted to argue after the fact that the child

26

would, in practice, have received services exceeding those set forth in the IEP.  See R.E.,
694 F.3d at 186-87.  Here, there has been no such retrospective attempt to alter the IEP
materially.

b.  Failure to Conduct FBA and Inaccurate BIP

The Parents also contend that L.N.'s IEP was procedurally deficient
because the IEP Team did not conduct an FBA and developed a "facially inadequate"
BIP.  (Pls.' Mem. at 28).  Specifically, the Parents contend that failure to conduct an FBA
resulted in a deficient BIP, which merely listed problematic behaviors and potential ways
to address them without providing guidance as to "how to apply different strategies to
different behaviors."  (Id. at 29).

The DOE is required to conduct an FBA for a student "whose behavior
impedes . . . her learning or that of others."  N.Y.C.R.R. § 200.4(b)(1)(v).  The failure to
conduct an FBA, therefore, is often "'a serious procedural violation' because it may
prevent the [CSE] 'from obtaining necessary information about the student's behaviors.'"
Y.S., 2013 WL 5722793, at *8 (quoting R.E., 694 F.3d at 190).  Nevertheless, the lack of
an FBA "will not always rise to the level of a denial of a FAPE."  R.E., 694 F.3d at 190.
"[W]hen an FBA is not conducted, the court must take particular care to ensure that the
IEP adequately identifies the child's problems," R.E., 694 F.3d at 190, and "prescribes
ways to manage them," Y.S., 2013 WL 5722793, at *8.

In this case, the IEP Team's failure to conduct an FBA, while certainly a
violation of the IDEA, did not deny L.N. a FAPE.  As the SRO found, the IEP Team

27

reviewed and discussed substantial documentary and anecdotal evidence furnished by

L.N.'s teachers and therapists at McCarton, including the McCarton "Behavior Reduction

Plan" and the notes of classroom observations of L.N.  (See SRO Decision at 29; Tr. at

55-60, 102, 168-69).  This data enabled the IEP Team to incorporate into the IEP

information concerning L.N.'s interfering behaviors, the factors that contributed to those

behaviors, and the ways to resolve them.  For example, the IEP recognized that L.N.'s

behavior "seriously interferes with instruction," and recommended that positive

reinforcement techniques be used to facilitate appropriate behavior, noting further that

redirection and repetition might be necessary to help L.N. remain focused.  (IEP at 4).

Similarly, the BIP, which is incorporated into the IEP, identified each of L.N.'s

interfering behaviors, and it described triggers for those behaviors, strategies to change

them, and additional supports required to facilitate improvement.  (IEP at 20); see A.C.,

553 F.3d at 172 (failure to conduct FBA not fatal because IEP included strategies to

address child's interfering behaviors).

        Turning to the allegedly inadequate BIP, although this document did not

contain the required data on the "frequency, duration, [and] intensity" of L.N.'s

interfering behaviors, see 8 NYCRR § 200.22(b)(4)(1), it clearly went beyond "simply

listing behaviors and strategies" in a non-differentiated manner.  C.F. ex rel. R.F. v. New

York City Dep't of Educ., 746 F.3d 68, 80 (2d Cir. 2014).  Indeed, the BIP expressly

matched L.N.'s interfering behaviors to the triggers for those behaviors and strategies to

change those behaviors.  As an example, the BIP recommended with regard to L.N.'s

non-contextual vocalizations and hand movements that a positive reinforcement schedule be used to maintain quiet and keep L.N.'s hands still.  (IEP at 20).  Further, the BIP recommended a specific form of positive reinforcement – a token economy system – to facilitate this strategy.  (Id.).  The BIP also proposed multiple steps to address L.N.'s physically inappropriate actions.  Finally, the BIP prioritized facilitating communication to address L.N.'s feelings of frustration and recognized that positive forms of communication needed to be "modeled and reinforced."  (Id.).  Given the wealth of information in the BIP regarding L.N.'s contextual triggers, recommended interventions, and preferred reinforcers, the SRO certainly had a basis to conclude that L.N.'s BIP did not result in the denial of a FAPE.  See T.Y. v. N.Y.C. Dep't of Educ., 584 F.3d 412, 419 (2d Cir. 2009) (consideration of strategies to address child's interfering behaviors supported SRO's decision that, notwithstanding the DOE's failure to conduct either an FBA or BIP, child was not denied a FAPE).

c.    Parent Training and Counseling

Finally, the Parents maintain that L.N.'s IEP was procedurally deficient because the DOE failed to recommend that the Parents receive training and counseling. (Pls.' Mem. at 31-32).  In New York, an IEP for a child with autism must provide for parent counseling and training.  R.E., 694 F.3d at 190-91 (citing 8 N.Y.C.R.R. § 200.13(d)).  Nevertheless, "the failure to include parent counseling in an IEP is less serious than the omission of an FBA."  Id. at 191.  Indeed, "[p]arents can file a complaint at any time if they feel they are not receiving this service."  Id.

The DOE's failure to include a parental training and counseling mandate plainly did not render L.N.'s IEP legally inadequate for several reasons.  First, although parent training and counseling was not specifically recommended, a number of DOE representatives testified that such services were provided at P188M.  For example, P188M's Assistant Principal indicated that parent counseling and training was available to parents on an as-needed basis and that the school offered periodic training sessions for parents on various relevant topics.  (Tr. at 415-16).  Similarly, Berke testified that P188M employed a parent coordinator who served as a liaison between the school and parents, and that she, as a classroom teacher, also met with parents throughout the year to discuss their concerns "at school and at home."  (Id. at 217, 280-81).  This mitigates any potential harm arising out of the failure to discuss this subject in the IEP.  See N.K. v. New York City Dep't of Educ., 961 F. Supp. 2d 577, 586-87 (S.D.N.Y. 2013) ("[W]here the recommended placement actually offers parent training and counseling, the failure to specifically note the availability of such training on a child's IEP does not constitute denial of a FAPE.").  Moreover, K.M. conceded that she had been receiving parent training and counseling for as long as L.N. had been diagnosed and that "[p]arent training probably takes on a different form as you're in the process longer."  (Tr. 602).  This, too, mitiagtes any procedural shortcoming.  See M.M. ex rel. A.M. v. N.Y.C. Dep't of Educ., 583 F. Supp. 2d 498, 509 (S.D.N.Y. 2008) (failure to provide for parent training and counseling mitigated because parents "received extensive parent training in the past and

have been actively involved in their child's education, communicating regularly with

teachers and service providers.").

### d.    Cumulative Effect of Procedural Violations

Although each of the procedural shortcomings alleged is not individually

dispositive, the Court also must determine whether they collectively gave rise to the

denial of a FAPE.  See R.E., 684 F.3d at 190 ("Multiple procedural violations may

cumulatively result in the denial of a FAPE even if the violations considered individually

do not.").  The failure to conduct an FBA, the flaws in the BIP, and the absence of a

parental-counseling mandate, all clearly constituted procedural violations of IDEA.

Nevertheless, even cumulatively, they did not render L.N.'s IEP legally inadequate.

Notwithstanding the FBA and BIP errors, L.N.'s IEP thoroughly considered his

interfering behaviors and developed strategies, based on the McCarton reports, to address

those behaviors.  Moreover, the failure to require parent-counseling and training

expressly could not have tipped the balance since those services are mandated and

essentially unrelated to L.N.'s direct educational needs.  See R.E., 694 F.3d at 191.

Indeed, notwithstanding any procedural violations, it is clear that the Parents'

dissatisfaction with the proposed classroom placement was the primary reason they

rejected the DOE's recommendations.  (See Ex. F at 1-2; see also Pls.' Mem. at 24-28).

### 3.    Substantive Compliance

"An appropriate public education under [the] IDEA is one that is 'likely to

produce progress, not regression.'"  Walczak, 142 F.3d at 130 (quoting Cypress-

Fairbanks Indep. Sch. Dist. v. Michael F., 118 F.3d 245, 248 (5th Cir. 1997)).  An IEP

therefore must be reasonably calculated to lead to more than trivial academic

advancement.  Id.  Nonetheless, as the Supreme Court has emphasized, the FAPE

requirement does not mean that the DOE must "maximize the potential" of students with

disabilities.  See Rowley, 458 U.S. at 189, 200.  Rather, because the focus is on equal

access, the education offered need merely to provide a meaningful opportunity for

advancement.  See id. at 198-204; Bay Shore Union Free Sch. Dist. v. Kain, 485 F.3d

730, 733 (2d Cir. 2007) (quoting D.D. ex rel. V.D. v. New York City Bd. of Educ., 480

F.3d 138, 139 (2d Cir. 2007) (states must provide disabled students a "basic floor of

meaningful, beneficial educational opportunity").

       A single substantive violation may be sufficient to support a claim for

reimbursement.  See, e.g., C.F., 746 F.3d at 81 ("We . . . hold that the failure to consider a

1:1 classroom resulted in the denial of a [FAPE]." ).  Here, the Parents allege two such

substantive violations:  first, that the DOE failed to provide L.N. with a school site for the

summer of 2011; second, that the DOE failed to recommend an appropriate classroom

placement.  While the first of these alleged errors arguably may be procedural rather than

substantive, see T.Y., 584 F.3d at 420 (rejecting procedural claim that IEP failed to name

a specific school location because "there is no [such] requirement in the IDEA"), I will

assume it is substantive since the Parents have presented it that way.  "As [the Second

Circuit has] noted on several occasions, '[b]ecause administrative agencies have special

expertise in making judgments concerning student progress, deference is particularly

32

important when assessing an IEP's substantive adequacy.'"  Id. at 418 (quoting Cerra, 427 F.3d at 195) (second alteration in original).

      a.    <u>School Placement</u>

      The Parents first claim that the summer construction at P188M, the school placement recommended by the FNR, resulted in L.N. being deprived of a school site for the summer of 2011.  (Pls.' Mem. at 19-22).  The DOE acknowledges that P188M was being renovated during that time period, explaining that P15M, a substitute school located only two blocks away, accommodated all of the students who were enrolled in P188M.  (Def.'s Mem. at 28-29).  In the DOE's view, the mere fact that L.N.'s proposed classroom was housed in an "alternate brick-and-mortar building" in no way suggests that the L.N.'s IEP could not have been implemented.  (Id. at 29).

      The right to a FAPE does not also entitle a student to "a particular brick-and-mortar location."  M.H. v. New York City Dep't of Educ., 712 F. Supp. 2d 125, 167 (S.D.N.Y. 2010), aff'd, 685 F.3d 217 (2d Cir. 2012) (citing T.Y., 584 F.3d at 419-20).  Although the IDEA does define the term "IEP" to mean a statement concerning "the anticipated frequency, location, and duration" of the specialized services to be provided, 20 U.S.C. § 1414(d)(1)(A)(i)(VII) (emphasis added), the United States Department of Education has explained that the "location of services in the context of an IEP generally refers to the type of environment that is the appropriate place for provision of the service[s].  For example, is the related service to be provided with the child's regular classroom or resource room."  64 Fed. Reg. 12406 (Mar. 12, 1999) (quoted in T.Y., 584

F.3d at 420).  Accordingly, "there is no requirement in the IDEA that the IEP name a specific school location."  T.Y., 584 F.3d at 420.

In keeping with these principles, the SRO concluded that "a future change in a school building does not amount to an actionable claim pursuant to the IDEA." (SRO Decision at 38).  The Parents contend that the SRO acknowledged disregarding federal district court precedent in arriving at this determination.  (Pls.' Mem. at 21) (citing SRO Decision at 34-35).  The SRO did state in the course of his discussion of the Parents' "Challenges to the Public School Site" that he "f[ou]nd it necessary to depart" from the holdings of several district court decisions."  (SRO Decision at 37).  This comment, however, addressed an entirely unrelated issue.  In R.E., the Second Circuit declared that "the use of retrospective testimony about what would have happened if a student had accepted the [DOE's] proposed placement must be limited to testimony regarding the services described in the student's [IEP]."  694 F.3d at 174.  Through this ruling, the R.E. court made clear that a school district could not seek to rewrite a defective IEP retrospectively by introducing evidence that its implementation of the IEP would have exceeded what was therein set forth.  Id.  Based on R.E., the SRO rejected several prior district court decisions that may have stated the law differently.  As he explained, after R.E., the adequacy of an IEP must be analyzed prospectively, while a challenge to the adequacy of the implementation of an IEP must be judged retrospectively.  (SRO Decision at 37).  Here, the Parents rejected the placement proposed by the DOE several days before the actual start of the 2011-12 school year, and more than one week before

34

K.M. first attempted to visit the school.  Accordingly, no matter how the implementation of an IEP should be analyzed, the SRO properly concluded that the substantive adequacy of the IEP proposed for L.N. had to be assessed prospectively.  To the extent that this holding departed from prior lower court decisions, it plainly correctly stated the law.  See R.E., 694 F.3d at 174.

In any event, even if the Parents' challenge could be read to contend that L.N.'s IEP could not be underlined implemented at P15M, where the proposed program had relocated, their argument would lack merit.  The record demonstrates that P15M contained at least one 6:1:1 classroom of students at L.N.'s academic and functional levels, within which L.N. could have been provided an additional one-to-one paraprofessional.  (Tr. at 410-411, 413).  That site also employed sufficient related service providers to fulfill L.N.'s related services mandate.  (Id. at 455-57).  In short, the temporary relocation of P188M to P15M conformed to the requirements of L.N.'s IEP, and the change of location was thus not a substantive violation.  See R.E. 694 F.3d at 195 ("[S]peculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement.").

Finally, although K.M. may not have known that L.N.'s class was housed at a different location, this arguably was not the DOE's fault.  First, P188M's Assistant Principal testified that P188M had notified all parents of currently-enrolled students about the move.  (Tr. at 443-44).  If L.N. had enrolled at P188M, the Parents therefore presumably would have been notified directly.  Additionally, Cruz testified that DOE

personnel placed signs on the doors of the building to alert parents to the change in location, and that security and custodial staff also were on site to inform parents who had not received a notice or seen the signs.  (Id. at 401-02).  Although K.M. testified that there were no signs or knowledgeable persons present at the site when she went to visit, this was several days after the school year began.  Moreover, the Parents had already rejected the IEP on June 30.  (See Ex. A).  In these circumstances, the Parents can scarcely complain about the DOE's failure to notify them about the relocation of a school that they already had decided L.N. would not attend.

> b.    6:1:1 Placement

The Parents' other substantive claim is that L.N.'s IEP was inadequate because the recommended 6:1:1 placement with a one-to-one behavior management paraprofessional would not have met L.N.'s learning needs.  The Parents contend that, as IHO Kehoe determined, L.N. instead required intensive one-to-one instruction of the type provided at McCarton in order to be able to learn.  (Pls.' Mem. at 24).

The IHO's relatively terse consideration of this claim turned on his observation that the IEP Team "adopted nearly every piece of evaluative data used in preparing [L.N.'s] IEP from [McCarton] but . . . rejected the substance of [McCarton's] programming," despite the absence of any opinion finding fault with such programming or supporting its removal.  (IHO Decision at 13).  The IHO also criticized Berke's hearing testimony, during which she conceded that she did not know "the type of programming that [L.N.] had been exposed to during the preceding year," was unfamiliar with the use

36

of a "transition plan," and thought that L.N. would be "appropriate for group instruction." (Id.).  The IHO further characterized this last aspect of Berke's testimony as "contrary" to the views of "all of the educators who had worked with [L.N.]."  (Id.).  Based on these observations, the IHO summarily concluded that the placement recommended in the IEP was insufficient to satisfy L.N.'s needs, but did not explain why the assignment of a one-to-one behavior management paraprofessional would not be a sufficient accommodation to enable L.N. to learn. The remainder of the IHO's analysis consists of a cursory review of the record, peppered with conclusory remarks, such as his observation that the DOE's BIP was "rendered virtually useless outside the context of the intensive ABA environment" and was an "example of what not to do for L.N."  (Id.).

By comparison, in a thorough and well-reasoned decision with citations to both the record and the relevant case law, SRO Bates determined that L.N. required "adult support to manage his [interfering behaviors]," but "that L.N. could function in a group setting with the provision of 1:1 prompting," and that such support would have been sufficiently provided through the IEP's recommended 6:1:1 placement augmented by a one-to-one behavior management paraprofessional.  (SRO Decision at 24).  The SRO's determination with respect to this issue is entitled to particular deference because disputes concerning the appropriate class size and student-teacher ratios for a student raise precisely the sort of educational policy issues "more appropriately answered by the state and district decision-makers than by federal judges."  D.J. v. New York City Dep't of Educ., No. 12 Civ. 7009 (PAC), 2013 WL 4400689, at *5 (S.D.N.Y. Aug. 15, 2013)

(quoting Watson ex rel Watson v. Kingston City Sch. Dist., 325 F. Supp. 2d 141, 145

(N.D.N.Y. 2004)) (internal quotation marks omitted); see R.E., 694 F.3d at 192 ("The

adequacy of 1:1 paraprofessional support as opposed to 1:1 teacher support is precisely

the kind of educational policy judgment to which we owe the state deference if it is

supported by sufficient evidence.").

 In the course of arguing that the SRO missed the mark, the Parents maintain

that Chan and all of L.N.'s related services providers contended that L.N. "required one-

to-one teaching at all times in order to learn and, in particular, to learn any new skills."

(Pls.' Mem. at 24).  Chan, in fact, was the only hearing witness to comment about the

merits of substituting a one-to-one behavior management paraprofessional for someone

qualified to teach L.N. on a one-to-one basis in the classroom.[13]  To be sure, Chan

testified that having just one teacher in the classroom would be a problem because L.N.

"would only learn skills with this one person and never be able to perform these skills

with other people."  (Tr. at 305).  Chan noted that having five other teachers in the

classroom therefore would help L.N. to "generalize."  (Id.).  However, when Chan was

asked about the learning environment eventually proposed – a 6:1:1 placement with a

---

[13]  While the Parents claim that the SRO incorrectly assumed that the one-to-one
behavior management paraprofessional would be required to assist the special education teacher
with instruction, something a paraprofessional arguably is not authorized to do, (Pls.' Mem.
at 27), both the SRO's decision and the record clearly indicate that the role of L.N.'s
paraprofessional was always assumed to be limited to addressing L.N.'s interfering behaviors
and keeping him focused.  (See, e.g., SRO Decision at 24 (noting that L.N. "required adult
support to manage his behaviors that interfered with learning so he could benefit from
instruction") (emphasis added)).

dedicated one-to-one behavior management paraprofessional – her testimony was considerably more equivocal than the Parents suggest.

Thus, Chan testified that the McCarton staffing formula was necessary because, when "a challenging behavior arises, [L.N.] needs immediate redirection from an adult . . . to keep him on task." (Id. at 319). This, of course, appears to be precisely what the dedicated one-to-one behavior management specialist would have been tasked to do. Furthermore, Chan did not testify that L.N. could not learn in the environment proposed in the IEP, but, rather, that it was not the best environment for him. (Id. at 342). Thus, she conceded that the staffing proposed by the DOE would enable L.N. to follow a schedule, but opined that "learning in that setting would be difficult for him." (Id. at 341). As she further explained, while L.N. could be redirected to follow a schedule, that form of instruction was, in her view, not the "best environment" or the "best way for him to learn new skills." (Id. at 342); see also id. at 343 ("I know that that's not the way [L.N.] learns best.")). As noted previously, however, the DOE need not provide students who have learning disabilities with the best possible environment in which to learn. See Rowley, 458 U.S. at 189. Accordingly, in the absence of any direct evidence establishing that L.N. could not learn in the environment proposed in the IEP, it was well within the SRO's discretion to reverse the IHO. See R.E., 694 F.3d at 192 (SRO properly found 6:1:1 classroom with dedicated one-to-one paraprofessional substantively adequate despite contrary testimony of two McCarton witnesses); F.L. ex rel. F.L. v. New York City Dep't of Educ., 553 F. App'x 2, 8 (2d Cir. 2014) (affirming SRO's finding that

student was not denied FAPE where IEP recommended a 6:1:1 placement with dedicated one-to-one paraprofessional and the McCarton representatives failed to explain why student could not learn under that scheme); E.E. v. New York City Dep't of Educ., No. 13 Civ. 06709 (LGS), 2014 WL 4332092, at *8-10 (S.D.N.Y. Aug. 21, 2014) (same).

Moreover, there are at least two fundamental differences between this case and C.L. v. New York City Dep't of Educ., 552 Fed. App'x. 81 (2d Cir. 2014), cited by the Parents in their motion papers. (See Pls.' Mem. at 24-25). First, prior to the appeal to the Second Circuit in that case, Judge Rakoff had found that the IHO's opinion was "far better reasoned" than that of the SRO, which was described by Judge Rakoff as not "well-reasoned" and failing to "grapple with [the] contrary evidence" presented by the McCarton witnesses. See C.L. v. New York City Dep't of Educ., No. 12 Civ. 1676 (JSR), 2013 WL 93361, at *7 (S.D.N.Y. Jan. 3, 2013). Here, by comparison, it is the SRO who undertook the more painstaking analysis. Indeed, as previously explained, the IHO simply hung his hat on one substantive argument that he accepted without much explanation. Second, in C.L. a McCarton witness testified that a one-to-one behavior management paraprofessional was inadequate to accommodate the child's needs. As the witness explained, "while the paraprofessional could impose consequences for disruptive behavior, that was not the main obstacle to [the child's] learning." Id. at *6. Thus, one-to-one instruction was necessary to keep the child "engaged, active, and on task." Id. Here, however, Chan acknowledged that a behavior management paraprofessional would

be able to keep L.N. "on schedule" and redirect him from interfering behaviors.  (Tr. at 342).

In sum, the SRO issued a thorough and well-reasoned decision after reviewing a record which was devoid of any evidence that L.N. was incapable of learning in a 6:1:1 placement with the support of a one-to-one behavior management paraprofessional and extensive related services.  Therefore the SRO's determination must be given deference, and the Parents' argument that the IEP's recommended placement was inappropriate must be rejected.[14]

## IV.   The Subpoena Duces Tecum

The Parents argue, in the alternative, that the Court should remand this case to the IHO and require that the DOE comply with one of several subpoenas that they had issued in an effort to obtain documents related to L.N.'s placement.  (See Pls.' Mem. at 34; Brescia Dec. Ex. F ("Subpoena")).  The Parents made this same argument before the SRO, who declined to enforce the Subpoena or sanction the DOE.  (See SRO Decision at 13-14).  Even a cursory review shows that the information sought through the Subpoena would be either cumulative or irrelevant.  Moreover, apart from indicating that this information is, in fact, "relevant," (Pls.' Mem. at 34), the Parents have failed to offer any explanation as to how they have been prejudiced by the DOE's failure to comply.

---

[14]   For this reason, I have not addressed the remaining two prongs of the Burlington/Carter test in this Report and Recommendation.

41

Because the IHO and SRO reasonably concluded that the record had been sufficiently developed, this final alternative request also should be denied.

V.     Conclusion

For the foregoing reasons, the Parents' motion for summary judgment, (ECF No. 13), should be denied, and the DOE's cross-motion for summary judgment, (ECF No. 18), should be granted.

VI.    Notice of Procedure for Filing Objections to this Report and Recommendation

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (d).  Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Lewis A. Kaplan and to my chambers at the United States Courthouse, 500 Pearl Street, New York, N.Y. 10007.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for an extension of time for filing objections must be directed to Judge Kaplan.  The failure to file timely objections will result in a waiver of those objections for purposes of appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).


Dated:     New York, New York
           March 3, 2015

                                        _____
                                              FRANK MAAS
                                        United States Magistrate Judge


Copies to All Counsel via ECF